**No. 25-5416**

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

McKee Foods Corporation,

*Plaintiff-Appellee,*

v.

BFP Inc.,

*Defendant,*

&

Carter Lawrence,

*Defendant-Appellant.*

On appeal from the United States District Court
for the Eastern District of Tennessee
No. 1:21-cv-279

## The Insurance Commissioner's Opening Brief

Jonathan Skrmetti
  *Attorney General & Reporter*
J. Matthew Rice
  *Solicitor General*
Gabriel Krimm
  *Senior Assistant Solicitor General*
Michael N. Wennerlund
  *Assistant Attorney General*
State of Tennessee
Office of the Attorney General
P.O. Box 20207
Nashville, TN 37202
Gabriel.Krimm@ag.tn.gov
(615) 532-5596
  *Counsel for the Commissioner of*
  *the Tennessee Department of*
  *Commerce & Insurance*

**TABLE OF CONTENTS**

Jurisdiction ............................................................................... xv

Issues...................................................................................... xvi

Introduction .............................................................................. 1

Background ................................................................................ 3

Argument Summary ................................................................ 16

Argument ................................................................................ 17

I.   McKee lacks a justiciable claim to equitable relief. ......................... 17

    A.   McKee's claimed ERISA right of action provides it no pathway to court-ordered relief.................................. 17

    B.   To the extent ERISA permits suit, McKee has failed to properly establish the jurisdictional prerequisites. .................. 21

II.  ERISA does not preempt the Pharmacy Inclusion Laws................. 28

    A.   The challenged laws do not concern ERISA's purview. ........... 29

        1.   The laws do not target employee-benefit plans................. 29

        2.   The laws do not compel employers to provide any substantive benefits......................................... 32

    B.   The challenged laws do not frustrate ERISA's aims................ 41

    C.   The challenged laws regulate insurance. .................................. 43

        1.   Pharmacy networking is an insurance-industry practice subject to state regulation. .................................... 43

        2.   PBMs must comply with state law when they make and maintain pharmacy networks. .................................... 47

        3.   The record in this case provides no basis to protect McKee's PBM from state regulation. ................................. 50

III. The district court granted improper relief. ................................. 54

Conclusion............................................................................... 59

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aetna Life Ins. v. Borges,*
869 F.2d 142 (2d Cir. 1989) ............................................................. 32

*Alemite Mfg. Corp. v. Staff,*
42 F.2d 832 (2d Cir. 1930) ............................................................... 26

*Alessi v. Raybestos-Manhattan,*
451 U.S. 504 (1981) .......................................................................... 29

*Am. Council of Life Insurers v. Ross,*
558 F.3d 600 (6th Cir. 2009) ............................................................ 46

*Am. Med. Sec., Inc. v. Auto Club Ins. Ass'n,*
238 F.3d 743 (6th Cir. 2001) ............................................................ 48

*Ammex, Inc. v. Cox,*
351 F.3d 697 (6th Cir. 2003) ..................................................... *passim*

*Armstrong v. Exceptional Child Ctr., Inc.,*
575 U.S. 320 (2015) ............................................................. 19, 20, 21

*Ashford v. Univ. of Mich.,*
89 F.4th 960 (6th Cir. 2024) ............................................................ 41

*Ass'n of Am. Physicians & Surgeons v. FDA,*
13 F.4th 531 (6th Cir. 2021) ................................................. 28, 56, 58

*Associated Builders & Contractors v.*
*Mich. Dep't of Lab. & Econ. Growth,*
543 F.3d 275 (6th Cir. 2008) ................................................. xiv, 33, 47

*Atchley v. Travelers Ins.,*
489 S.W.2d 836 (Tenn. 1972) ............................................................. 3

*Bd. of Trs. of Glazing Health & Welfare Tr. v. Chambers,*
903 F.3d 829 (9th Cir. 2018) ..................................................... *passim*

ii

*Blue Cross & Blue Shield of Kan. City v. Bell*,
  798 F.2d 1331 (10th Cir. 1986) ................................................ 39, 40, 49

*Bostick v. Maxey*,
  37 Tenn. (5 Sneed) 173 (1857) ................................................................ 3

*Bowlin v. Federated Mut. Implement & Hardware Ins.*,
  357 S.W.2d 337 (Tenn. 1962) .................................................................. 3

*Boyle v. Anderson*,
  68 F.3d 1093 (8th Cir. 1995) ........................................................ *passim*

*Cal. Div. of Labor Standards Enf't v. Dillingham Const., N.A., Inc.*,
  519 U.S. 316 (1997) ............................................................................ 29, 30

*Carpenters Loc. Union No. 26 v. U.S. Fid. & Guar. Co.*,
  215 F.3d 136 (1st Cir. 2000) ................................................................. 31

*Chamber of Com. of U.S. v. Whiting*,
  563 U.S. 582 (2011) ............................................................................... 41

*Chase Bank USA, N.A. v. City of Cleveland*,
  695 F.3d 548 (6th Cir. 2012) ................................................................ 21

*Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*,
  474 F.3d 463 (7th Cir. 2007) ............................................... 6, 44, 48, 52

*Child.'s Healthcare is Legal Duty, Inc. v. Deters*,
  92 F.3d 1412 (6th Cir. 1996) .......................................................... 22, 25

*Christian Healthcare Ctrs., Inc. v. Nessel*,
  117 F.4th 826 (6th Cir. 2024) ...................................................... 22, 24, 58

*Cisneros v. UNUM Life Ins. of Am.*,
  134 F.3d 939 (9th Cir. 1998) ................................................................ 45

*Cohens v. Virginia*,
  19 U.S. (6 Wheat.) 264 (1821) .............................................................. 37

*Coleman v. Nationwide Life Ins.*,
  969 F.2d 54 (4th Cir. 1992) .................................................................. 48

iii

*Coomer v. Bethesda Hosp., Inc.*,
370 F.3d 499 (6th Cir. 2004) ................................................................. 8

*Corp. Health Ins. v. Tex. Dep't of Ins.*,
215 F.3d 526 (5th Cir. 2000) ......................................................... 45, 49

*Coyne & Delaney Co. v. Selman*,
98 F.3d 1457 (4th Cir. 1996) ........................................................ *passim*

*Crawford v. U.S. Dep't of Treasury*,
868 F.3d 438 (6th Cir. 2017) ................................................. 23, 24, 57

*Crugher v. Prelesnik*,
761 F.3d 610 (6th Cir. 2014) ........................................................ 17, 21

*Custer v. Sweeney*,
89 F.3d 1156 (4th Cir. 1996) ................................................. 10, 33, 48

*Daniel v. Eaton Corp.*,
839 F.2d 263 (6th Cir. 1988) ................................................................. 8

*Davis v. Passman*,
442 U.S. 228 (1979) ........................................................................... 17

*Davis v. United States*,
499 F.3d 590 (6th Cir. 2007) ........................................................ 18, 21

*De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*,
520 U.S. 806 (1997) .................................................................... xiv, 33

*Digital Media Sols., LLC v. S. Univ. of Ohio, LLC*,
59 F.4th 772 (6th Cir. 2023) ........................................................ 16, 54

*Doe v. Duling*,
782 F.2d 1202 (4th Cir. 1986) ................................................. 26, 54, 56

*Doe v. Lee*,
102 F.4th 330 (6th Cir. 2024) ...................................................... *passim*

*Doyle v. Hogan*,
1 F.4th 249 (4th Cir. 2021) ................................................................ 22

iv

*Dukes v. U.S. Healthcare, Inc.*,
57 F.3d 350 (3d Cir. 1995) ............................................................. 9, 46

*Edwards v. Prime, Inc.*,
602 F.3d 1276 (11th Cir. 2010) ......................................................... 37

*Ernst v. Rising*,
427 F.3d 351 (6th Cir. 2005) ............................................................. 28

*Express Scripts, Inc. v. Wenzel*,
262 F.3d 829 (8th Cir. 2001) ................................................. 38, 46, 49

*Fair Assessment in Real Estate Ass'n, Inc. v. McNary*,
454 U.S. 100 (1981) ............................................................................ 28

*Fialka-Feldman v. Oakland Univ. Bd. of Trs.*,
639 F.3d 711 (6th Cir. 2011) ............................................................. 26

*Firestone Tire & Rubber Co. v. Neusser*,
810 F.2d 550 (6th Cir. 1987) ............................................................. 33

*Firexo, Inc. v. Firexo Grp. Ltd.*,
99 F.4th 304 (6th Cir. 2024) ............................................................. 38

*Flast v. Cohen*,
392 U.S. 83 (1968) ........................................................................ 17, 56

*Fort Halifax Packing Co. v. Coyne*,
482 U.S. 1 (1987) ............................................................................ 8, 34

*Freed v. Thomas*,
976 F.3d 729 (6th Cir. 2020) ............................................................. 37

*Friends of George's, Inc. v. Mulroy*,
108 F.4th 431 (6th Cir. 2024) ........................................... 23, 24, 57, 58

*Gibbons v. Ogden*,
22 U.S. (9 Wheat.) 1 (1824) ................................................................. 4

*Gobeille v. Liberty Mut. Ins. Co.*,
577 U.S. 312 (2016) ...................................................................... 30, 34

v

*Golden Gate Rest. Ass'n v. City & Cnty. of S.F.*,
546 F.3d 639 (9th Cir. 2008)..................................................8, 9, 29, 34

*Golden State Transit Corp. v. Los Angeles*,
493 U.S. 103 (1989) ...................................................................... 19, 20

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) ................................................................................42

*Guyan Int'l, Inc. v. Pro. Benefits Adm'rs, Inc.*,
689 F.3d 793 (6th Cir. 2012)................................................................48

*Haaland v. Brackeen*,
599 U.S. 255 (2023) ...............................................................................55

*Haddad v. Alexander, Zelmanski, Danner & Fioritto, PLLC*,
758 F.3d 777 (6th Cir. 2014)................................................................37

*Halperin v. Richards*,
7 F.4th 534 (7th Cir. 2021) ................................................................8, 9

*Haynes v. United States*,
353 U.S. 81 (1957).................................................................................3, 8

*Heard v. Strange*,
127 F.4th 630 (6th Cir. 2025) ..............................................................42

*Hewitt v. Helms*,
482 U.S. 755 (1987)................................................................................55

*In re Arctic Exp. Inc.*,
636 F.3d 781 (6th Cir. 2011)..................................................................9

*In re Cannon*,
277 F.3d 838 (6th Cir. 2002)..................................................................9

*Ingersoll-Rand Co. v. McClendon*,
498 U.S. 133 (1990)................................................................................34

*J.B.D.L. Corp. v. Wyeth-Ayerst Lab'ys, Inc.*,
485 F.3d 880 (6th Cir. 2007)....................................................5, 39, 40

*Jacobson v. Massachusetts,*
  197 U.S. 11 (1905) ................................................................. 4

*Jama v. ICE,*
  543 U.S. 335 (2005) .............................................................. 37

*Jude v. Comm'r of Soc. Sec.,*
  908 F.3d 152 (6th Cir. 2018) ................................................ 22

*Kallstrom v. City of Columbus,*
  136 F.3d 1055 (6th Cir. 1998) .............................................. 57

*Kansas v. Garcia,*
  589 U.S. 191 (2020) .............................................................. 41

*Keen v. Helson,*
  930 F.3d 799 (6th Cir. 2019) ................................................ 18

*Ky. Ass'n of Health Plans, Inc. v. Nichols,*
  227 F.3d 352 (6th Cir. 2000) .......................... 36, 37, 39, 49

*Knop v. Johnson,*
  977 F.2d 996 (6th Cir. 1992) ................................................ 58

*Ky. Ass'n of Health Plans, Inc. v. Miller,*
  538 U.S. 329 (2003) ..................................................... *passim*

*L.W. ex rel. Williams v. Skrmetti,*
  73 F.4th 408 (6th Cir. 2023) .......................... 25, 56, 57, 58

*Lane v. Goren,*
  743 F.2d 1337 (9th Cir. 1984) .............................................. 32

*Lindke v. Freed,*
  114 F.4th 812 (6th Cir. 2024) .............................................. 19

*Littler v. Ohio Ass'n of Pub. Sch. Emps.,*
  88 F.4th 1176 (6th Cir. 2023) ........................................ 18, 21

*Lockheed Corp. v. Spink,*
  517 U.S. 882 (1996) ......................................................... 50, 51

vii

*Lupo v. Human Affairs Int'l, Inc.*,
   28 F.3d 269 (2d Cir. 1994) .................................................................. 46

*Mackey v. Lanier Collection Agency & Serv., Inc.*,
   486 U.S. 825 (1988) .......................................................................... 31

*McGrew v. Duncan*,
   937 F.3d 664 (6th Cir. 2019) ............................................................. 41

*McKee Foods Corp. v. BFP Inc.*,
   No. 1:21-cv-279, 2025 WL 968404
   (E.D. Tenn. Mar. 31, 2025) ......................................................... *passim*

*McKee Foods Corp. v. BFP, Inc.*,
   No. 23-5170, 2024 WL 1213808
   (6th Cir. Mar. 21, 2024) ...................................................... 11, 12, 27

*Med. Mut. of Ohio v. deSoto*,
   245 F.3d 561 (6th Cir. 2001) ......................................................... 43, 51

*Metro. Life Ins. v. Massachusetts*,
   471 U.S. 724 (1985) ................................................................... *passim*

*Mikel v. Quin*,
   58 F.4th 252 (6th Cir. 2023) ............................................................. 26

*Minnesota ex rel. Whipple v. Martinson*,
   256 U.S. 41 (1921) ............................................................................. 4

*N. Va. Hemp & Agric., LLC v. Virginia*,
   125 F.4th 472 (4th Cir. 2025) ........................................................... 42

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins.*,
   514 U.S. 645 (1995) ...................................................... 29, 32, 34, 41

*Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*,
   414 U.S. 453 (1974) .......................................................................... 17

*New State Ice Co. v. Liebmann*,
   285 U.S. 262 (1932) .......................................................................... 59

viii

*NYS Health Maint. Org. Conf. v. Curiale,*
  64 F.3d 794 (2d Cir. 1995) ......................................................30, 32, 36

*Ohio v. Madeline Marie Nursing Homes,*
  694 F.2d 449 (6th Cir. 1982) ........................................................22, 25

*Ohio v. Yellen,*
  53 F.4th 983 (6th Cir. 2022) ..............................................................24

*Ostrewich v. Tatum,*
  72 F.4th 94 (5th Cir. 2023) ................................................................22

*PCMA v. Mulready,*
  78 F.4th 1183 (10th Cir. 2023) ........................................................40

*Pac. Mut. Life Ins. v. Walt,*
  277 S.W.2d 434 (Tenn. 1955)..............................................................3

*Pegram v. Herdrich,*
  530 U.S. 211 (2000) ...................................................................*passim*

*Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp.,*
  399 F.3d 692 (6th Cir. 2005).........................................................48, 51

*Perez v. Ledesma,*
  401 U.S. 82 (1971) ..............................................................................55

*Pharm. Soc'y of N.Y., Inc. v. Lefkowitz,*
  586 F.2d 953 (2d Cir. 1978) .................................................................4

*Potter v. Hughes,*
  546 F.3d 1051 (9th Cir. 2008)............................................................17

*RLR Invs., LLC v. City of Pigeon Forge,*
  4 F.4th 380 (6th Cir. 2021) ................................................................37

*PCMA v. Rowe,*
  429 F.3d 294 (1st Cir. 2005) ......................................................*passim*

*PCMA v. Rowe,*
  No. CIV.03-153, 2005 WL 757608 (D. Me. Feb. 2, 2005).....................35

*Rush Prudential HMO, Inc. v. Moran,*
  536 U.S. 355 (2002) ........................................................................*passim*

*Rutledge v. PCMA,*
  592 U.S. 80 (2020) ..........................................................................*passim*

*Safety Specialty Ins. v. Genesee Cnty. Bd. of Comm'rs,*
  53 F.4th 1014 (6th Cir. 2022) .................................................................28

*Saltzman v. Indep. Blue Cross,*
  384 F. App'x 107 (3d. Cir. 2010) ..............................................5, 39, 40

*Schmitt v. LaRose,*
  933 F.3d 628 (6th Cir. 2019) ...................................................................16

*Scott v. Schedler,*
  826 F.3d 207 (5th Cir. 2016) ...................................................................57

*Self-Ins. Inst. of Am., Inc. v. Synder (SIIA II ),*
  827 F.3d 549 (6th Cir. 2016) ......................................................10, 33, 47

*Shaw v. Delta Air Lines,*
  463 U.S. 85 (1983) ..............................................................................20, 21

*Soehlen v. Fleet Owners Ins. Fund,*
  844 F.3d 576 (6th Cir. 2016) ...................................................................22

*Steffel v. Thompson,*
  415 U.S. 452 (1974) ..................................................................................55

*Stuart Circle Hosp. Corp. v. Aetna Health Mgmt.,*
  995 F.2d 500 (4th Cir. 1993) ..............................................................38, 49

*Tex. All. for Retired Ams. v. Scott,*
  28 F.4th 669 (5th Cir. 2022) ....................................................................22

*Tex. Pharmacy Ass'n v. Prudential Ins. of Am.,*
  105 F.3d 1035 (5th Cir.1997)...................................................................45

*Thiokol Corp. v. Roberts,*
  76 F.3d 751 (6th Cir. 1996).............................................................*passim*

x

*Torres v. Precision Indus., Inc.,*
  938 F.3d 752 (6th Cir. 2019) ............................................................. 20

*Travelers Indem. Co. v. Bowling Green Pro. Assocs., PLC,*
  495 F.3d 266 (6th Cir. 2007) ............................................................. 16

*Trs. of Sheet Metal Workers Loc. 7 Zone 1 Pension Fund v.*
  *Pro Servs., Inc.,*
  65 F.4th 841 (6th Cir. 2023) ............................................................... 8

*Union Home Mortg. Corp. v. Cromer,*
  31 F.4th 356 (6th Cir. 2022) ............................................................. 57

*W. Va. Univ. Hosps., Inc. v. Casey,*
  499 U.S. 83 (1991) ............................................................................. 42

*Washington Physicians Serv. Ass'n v. Gregoire,*
  147 F.3d 1039 (9th Cir. 1998) ..................................................... *passim*

*Watson v. Maryland,*
  218 U.S. 173 (1910) ............................................................................. 4

*Whole Woman's Health v. Jackson (Jackson I),*
  141 S. Ct. 2494 (2021) ................................................................. 26, 56

*Whole Woman's Health v. Jackson (Jackson II),*
  595 U.S. 30 (2021) ....................................................................... 26, 56

*Will v. Mich. Dep't of State Police,*
  491 U.S. 58 (1989) ............................................................................. 42

*Wilson v. Safelite Grp., Inc.,*
  930 F.3d 429 (6th Cir. 2019) ............................................................... 8

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ............................................................................... 55

*Wright v. Spaulding,*
  939 F.3d 695 (6th Cir. 2019) ............................................................. 37

*Younger v. Harris,*
  401 U.S. 37 (1971) ............................................................................. 24

## Constitutional Provision

U.S. Const. art. III, § 2, cl. 1 ................................................................28

## Code Provisions

28 U.S.C. § 1291................................................................................xv

28 U.S.C. § 1331................................................................................xv

28 U.S.C. § 2201................................................................................55

29 U.S.C. § 1001..................................................................................8

29 U.S.C. § 1002...................................................................9, 10, 51

29 U.S.C. § 1132.......................................................................*passim*

29 U.S.C. § 1144.......................................................................*passim*

42 U.S.C. § 1983................................................................................20

Tenn. Code Ann. § 53-10-201 ............................................................ 4

Tenn. Code Ann. § 56-7-2359 ...........................................................34

Tenn. Code Ann. § 56-7-3102 ...........................................................30

Tenn. Code Ann. § 56-7-3120 ...........................................25, 27, 34, 58

Tenn. Code Ann. § 56-7-3121 .....................................................*passim*

## Session Law

Employee Retirement Income Security Act,
    Pub. L. No. 93-406, 88 Stat. 829 (1974) ....................................... 8

## Public Debates

Tennessee House of Representatives,
    Finance, Ways, and Means Subcommittee
    Hearing (Apr. 26, 2022) ................................................................ 7

Tennessee Senate,
  Floor Debate (Apr. 27, 2022) ..............................................................7

**Other Authorities**

Matthew Fiorillo, *Overdosed*,
  60 S. Tex. L. Rev. 565 (2019) ...............................................................5

Restatement (Third) of Trusts § 2 .........................................................9

Susan Randall, *Insurance Regulation in the United States*,
  26 Fla. St. U. L. Rev. 625 (1999) .......................................................3, 4

## ORAL ARGUMENT REQUEST

"This is another . . . ERISA[] pre-emption case." *Associated Build-ers & Contractors v. Mich. Dep't of Lab. & Econ. Growth*, 543 F.3d 275, 277 (6th Cir. 2008) (quoting *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 808 (1997)). The merits questions are "not . . . easy." *Id.* at 279. And this Court cannot reach them without first confronting several complex threshold issues regarding Plaintiff-Appellee McKee Foods Corporation's purported right to sue. For these reasons, Defendant-Appellant Carter Lawrence (sued in his official capacity as Tennessee's Commissioner of Commerce and Insurance) respectfully requests oral argument to assist the Court's review.

## JURISDICTION[*]

The district court had limited original jurisdiction because McKee asserted a right of action "arising under" ERISA.  28 U.S.C. § 1331; *see* Am. Compl., R.83 at 1082 (citing 29 U.S.C. § 1132(a)(3)); *see also infra* Argument Part I (discussing the limits of such jurisdiction).

This Court has appellate jurisdiction because Commissioner Lawrence filed a timely notice appealing the district court's final order and judgment.  *See* Notice, R.145 at 2255; 28 U.S.C. § 1291.

---

[*] Pincites to district court filings use the PageID file-stamp pagination.

## ISSUES

1. Can McKee sue Commissioner Lawrence to prevent him from enforcing Tennessee law under hypothetical future circumstances?

2. Does ERISA preempt the Tennessee laws that regulate the construction and maintenance of pharmacy networks?

3. Did the district court err in granting expansive, abstract relief purporting to settle the rights of nonparties?

## INTRODUCTION

This Court should reverse the decision below, which adds to the ever-growing snowball of muddled ERISA jurisprudence. Plaintiff-Appellee McKee Foods helps its employees buy prescription drugs. The original Defendant, Thrifty Med Plus Pharmacy, once had a deal with McKee to sell those drugs. When McKee and Thrifty had a falling out, both tried to rope Tennessee's Insurance Commissioner, Carter Lawrence, into their dispute. But as the dispute abated, Commissioner Lawrence ended up the only loser. Now, a federal court order prevents him from enforcing Tennessee's insurance laws under circumstances neither present nor impending. That order rests on multiple reversible errors.

*First*, the district court granted relief without any underlying justiciable claim. McKee has sued under a statutory right of action permitting injunctions to prevent ERISA "violations." But this case does not present circumstances under which an injunction may issue consistent with ERISA's text and the tenets of sovereign immunity. To begin, Commissioner Lawrence does not "violate" ERISA by attempting to enforce a law that ERISA may, in some cases, supersede. And regardless, there is no imminent threat of any such action being taken against McKee.

1

*Second*, even if the district court had a proper basis for adjudicating McKee's claims, the court still should have rejected those claims as improper attempts to expand ERISA preemption. The laws at issue in this case regulate a common cost-cutting practice in the world of prescription-drug insurance: the grouping of pharmacies into "networks" that offer discounted drug prices in exchange for sales volume. Federal courts have yet to determine whether the "substance" of coverage under an insurance policy includes the selection of pharmacies in the policy's network. But either it does, or it does not — and ERISA would not preempt state pharmacy-networking laws either way. As best understood, pharmacy networking is a non-substantive cost-control practice that can be regulated without dictating ERISA-plan benefits. But if networking practices constitute a substantive aspect of coverage, the laws challenged here necessarily regulate insurance and are saved from ERISA preemption.

*Finally*, and all else aside, the district court erred by failing to properly cabin its remedy. It attempted to reach beyond the facts of this case and provide speculative relief to nonparties. This compels vacatur of the remedial orders as inconsistent with Article III.

2

## BACKGROUND

This case stands at the intersection between the States' longstanding regulation of insurance and Congress's well-meaning but confusion-plagued effort to police employee fringe-benefit programs.

***Insurance, Drugs, and PBMs.*** The best place to start is with the concept of insurance. At bottom, insurance is a form of contract wherein Person A (the "insured") pays Person B (the "insurer") in exchange for a promise to cover some future expense. *See, e.g.*, *Haynes v. United States*, 353 U.S. 81, 83 (1957). There is an insurance product for every imaginable expense, but the most common cover everyday risks like property damage, "accident," and "sickness." *Pac. Mut. Life Ins. v. Walt*, 277 S.W.2d 434, 435 (Tenn. 1955); *see, e.g.*, *Atchley v. Travelers Ins.*, 489 S.W.2d 836, 836 (Tenn. 1972); *Bowlin v. Federated Mut. Implement & Hardware Ins.*, 357 S.W.2d 337, 337 (Tenn. 1962).

In this country, "[t]he [S]tates regulate insurance." Susan Randall, *Insurance Regulation in the United States*, 26 Fla. St. U. L. Rev. 625, 626 (1999). As a form of contract with huge social implications, States have long governed insurance through a well-developed common-law jurisprudence. *See, e.g.*, *Bostick v. Maxey*, 37 Tenn. (5 Sneed) 173, 177 (1857).

3

And "[e]ach state has" also created an executive department "to regulate insurance" more proactively. Randall, *supra*, at 629. For decades, these insurance commissions have been tasked with "oversee[ing]" the "trade practices" of the industry. *Id.* at 632 n.35; *see id.* at 630–32 & n.18.

Not coincidentally, States also have the primary authority to regulate the goods and services often purchased through insurance — including, as relevant here, pharmacy services and drugs. *See Minnesota ex rel. Whipple v. Martinson*, 256 U.S. 41, 43–45 (1921); *Watson v. Maryland*, 218 U.S. 173, 176 (1910); *see also Pharm. Soc'y of N.Y., Inc. v. Lefkowitz*, 586 F.2d 953, 958 (2d Cir. 1978) (distinguishing between state power and federal power in this area). The protection of public health and welfare has long been considered state government's purview. *See Jacobson v. Massachusetts*, 197 U.S. 11, 30 (1905); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 203 (1824). And as medical science produced increasingly effective and expensive drugs, it ushered in the era of state-regulated drug prescription, drug marketing, and drug insurance. *See, e.g.*, Tenn. Code Ann. § 53-10-201 *et seq.* (Tennessee Affordable Drug Act); *id.* § 53-10-301 *et seq.* (Tennessee Prescription Safety Act); *id.* § 56-7-3701 *et seq.* (Prior

4

Authorization Fairness Act); *see generally* Matthew Fiorillo, *Overdosed*, 60 S. Tex. L. Rev. 565 (2019).

In this marketplace, most prescription drugs taken at home reach the consumer through a multi-leveled transaction. *See Rutledge v. PCMA*, 592 U.S. 80, 83–84 (2020). On the first level, the drug's manufacturer sells the drug to a wholesaler, who sells it to a pharmacist, who sells it to a consumer, who pays for the drug like any other product.



But prescription-drug insurance typically adds a second level to the transaction. On that level, the consumer pays a "premium" to an insurer in exchange for a promise to help purchase specific drugs on a pre-set list called a "formulary." *See J.B.D.L. Corp. v. Wyeth-Ayerst Lab'ys, Inc.*, 485 F.3d 880, 884 (6th Cir. 2007); *Saltzman v. Indep. Blue Cross*, 384 F. App'x 107, 109 nn.3 & 4 (3d Cir. 2010). Then, when the consumer needs a drug on the formulary, he typically pays the pharmacist part of the purchase price (called a "co-pay") while the insurer "covers" the rest of the drug's cost. *See Saltzman*, 384 F. App'x at 109 n.3.

5



Increasingly, however, insurers are creating a third level to the transaction by hiring cost-cutting middlemen. On this intermediate level, a "pharmacy benefit manager," or "PBM," works to reduce the insurer's expenses by standing between the insurer and the other parties to the transaction. *See* Plan Summary, R.118-1 at 1605; *Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 466 (7th Cir. 2007); *PMCA v. Rowe*, 429 F.3d 294, 298 (1st Cir. 2005). Instead of the insurer paying the pharmacy for the drug, the insurer now pays the PBM, who in turn pays the pharmacy. *See Rutledge*, 592 U.S. at 84. And the PBM makes money by creating a "spread": paying the pharmacy less for the drug than it charged the insurer in fees. *See id.*



6

A PBM can make a spread by numerous means, but the only one relevant here is pharmacy networking.  This practice involves "steering" insureds toward certain pharmacies through incentives, like lower co-pays.  *See Rowe*, 429 F.3d at 298.  The PBM then uses this steering power as leverage to negotiate lower retail drug prices.  *See Rutledge*, 592 U.S. at 84.  The practice necessarily works some disadvantage to other interested parties.  *See Rowe*, 429 F.3d at 298.  And in some rural communities, it has created drug-access issues through the closure of small pharmacies that often get excluded from pharmacy networks.  *See* Tennessee House of Representatives, Finance, Ways, and Means Subcommittee Hearing at 46:34–46:52 (Apr. 26, 2022) (statement of Rep. Cepicky)[1]; *see also* Tennessee Senate, Floor Debate at 24:30–24:37 (Apr. 27, 2022) (statement of Sen. Reeves) (calling the challenged legislation a "really, really big win for small pharmacies and patients in rural communities").[2]

***Fringe Benefits and ERISA.***  It would not be controversial for States to restrict pharmacy-networking practices if not for the federal government's separate effort to regulate employee "fringe benefits."

---

[1] https://tnga.granicus.com/player/clip/26968?view_id=610&redirect=true
[2] https://tnga.granicus.com/player/clip/26977?view_id=610&redirect=true

7

*Daniel v. Eaton Corp.*, 839 F.2d 263, 265 (6th Cir. 1988). Such benefits gained popularity as a form of compensation in the early 20th Century. *See, e.g.*, *Haynes*, 353 U.S. at 82. And they often came to look and function much like insurance. *See, e.g.*, *id.*; *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 14 n.9 (1987). By the mid-1970s, Congress was concerned that employers were not doing enough to avoid breaking their fringe-benefit promises. *See Halperin v. Richards*, 7 F.4th 534, 549 (7th Cir. 2021); *see also* 29 U.S.C. § 1001 (describing purpose). And Congress tried to solve the problem through the Employee Income Retirement Security Act, often abbreviated to "ERISA." Pub. L. No. 93-406, 88 Stat. 829 (1974), *codified as amended at* 29 U.S.C. § 1001 *et seq.*

"Although ERISA 'is a complex statute,' its 'purpose'" at bottom "'is simple.'" *Trs. of Sheet Metal Workers Loc. 7 Zone 1 Pension Fund v. Pro Servs., Inc.*, 65 F.4th 841, 847 (6th Cir. 2023) (quoting *Wilson v. Safelite Grp., Inc.*, 930 F.3d 429, 434 (6th Cir. 2019)). ERISA does not require employers to offer fringe benefits to their employees. *Coomer v. Bethesda Hosp., Inc.*, 370 F.3d 499, 508 (6th Cir. 2004). But if an employer does promise such benefits, ERISA "protects [the] funds" that will be used to provide them. *Wilson*, 930 F.3d at 434; *see Golden Gate Rest. Ass'n v. City*

8

*& Cnty. of S.F.*, 546 F.3d 639, 647 (9th Cir. 2008); *Dukes v. U.S. Healthcare, Inc.*, 57 F.3d 350, 357 (3d Cir. 1995).

To accomplish this, Congress drew on the common-law concept of trusts. *See Halperin*, 7 F.4th at 546. In a trust, property called the "corpus" or "res" has its "equitable title" split from its "legal title." *See In re Cannon*, 277 F.3d 838, 850 (6th Cir. 2002). This happens when the owner (or "settlor") transfers the property to a second-party "trustee" while stipulating that it be kept and used for the enrichment of "one or more" third-party "beneficiaries." *In re Arctic Exp. Inc.*, 636 F.3d 781, 792 (6th Cir. 2011) (quoting Restatement (Third) of Trusts § 2 cmt. f (2003)). In accepting this arrangement, the trustee assumes "fiduciary duties" to the beneficiaries, which the beneficiaries can enforce through the trust documents in court. *Cannon*, 277 F.3d at 850.

ERISA treats certain fringe-benefit programs — called "plans" — as a form of federally regulated trust. *See* 29 U.S.C. § 1002(3); *Golden Gate*, 546 F.3d at 649. Like a settlor, an employer can "sponsor" an ERISA plan through documents that put aside funds to be kept and used for fringe benefits. *Bd. of Trs. of Glazing Health & Welfare Tr. v. Chambers*, 903 F.3d 829, 848 (9th Cir. 2018), *vacated*, 923 F.3d 1162

9

(2019) (citing *Pegram v. Herdrich*, 530 U.S. 211, 223 (2000)). Employees being compensated through these plans are called "beneficiaries." *See* 29 U.S.C. § 1002(8). And those who exercise discretion in implementing the plans are called "fiduciaries." *See Coyne & Delaney Co. v. Selman*, 98 F.3d 1457, 1465–66 (4th Cir. 1996); *Custer v. Sweeney*, 89 F.3d 1156, 1161–62 (4th Cir. 1996). ERISA then imposes a host of restrictions and obligations on the fiduciaries for the sake of the beneficiaries. *See Chambers*, 903 F.3d at 837. And if a fiduciary breaches any one of those duties, a beneficiary can take legal action to "enforce his rights under . . . the plan." 29 U.S.C. § 1132(a)(1)(B); *see generally Self-Ins. Inst. of Am., Inc. v. Synder* (*SIIA II*), 827 F.3d 549, 554 (6th Cir. 2016).

In establishing this regime, Congress was respectful of preexisting state law, including the States' traditional regulation of both medicine and insurance. *See Rowe*, 429 F.3d at 301. It was no secret that ERISA might encroach on those traditional state prerogatives, particularly when the "benefits" at issue were promises to pay for "medical . . . care." 29 U.S.C. § 1002(1). So Congress explicitly provided for the "[s]upersedure" of "State laws" *only* "insofar as they . . . relate[d] to . . . employee benefit plan[s]." *Id.* § 1144(a). In other words, Congress made ERISA both a

10

ceiling and floor for *direct* ERISA-plan regulation. *See Thiokol Corp. v. Roberts*, 76 F.3d 751, 758, 761 (6th Cir. 1996). But so long as States did not attempt to regulate ERISA plans as insurance providers, Congress made clear that "nothing" in ERISA can "be construed to" preempt "any State law [that] regulates insurance." 29 U.S.C. § 1144(b)(2)(A).

***McKee's Dispute with Thrifty.*** This case concerns prescription-drug insurance provided through an ERISA plan. Plaintiff-Appellee McKee Foods is a large Tennessee-based employer with an employee-benefit plan that includes a prescription-drug program. *McKee Foods Corp. v. BFP, Inc.*, No. 23-5170, 2024 WL 1213808, at *1 (6th Cir. Mar. 21, 2024); *see* Plan Summary, R.118-1 at 1588–1610. As the plan sponsor, McKee claims to have "established the . . . terms and conditions of the plan, including . . . the benefits available . . . and the amounts contributed by McKee and plan participants." Am. Compl., R.83 at 1067. But the record also indicates that a PBM called MedImpact both created and may help dictate the conditions of participation in the McKee Plan's pharmacy network. *See* Plan Summary, R.118-1 at 1605; Robertson Email, R.119-5 at 1783; Compl., R.1 at 34.

11

This arrangement created some controversy when McKee and MedImpact "jointly" decided "to remove" a pharmacy called "Thrifty . . . from the [McKee] Plan's pharmacy network." Pellington Decl., R.139-1 at 2158. Unhappy with this decision, Thrifty tried to make Tennessee's government undo it. To that end, Thrifty "fil[ed] multiple administrative complaints against McKee" with the Tennessee Department of Commerce and Insurance, asking the Department to penalize McKee for violating the State's drug-insurance laws. *BFP*, 2024 WL 1213808, at *1; *see id.* at *2. And in response, McKee sued Thrifty on the theory that those same laws were preempted by ERISA. *See id.* at *1.

But what began as a dispute between McKee and Thrifty shifted in focus over time. In fact, Tennessee regulators dismissed Thrifty's administrative filings before Thrifty even responded to McKee's complaint. *See id.* at *2. And Thrifty eventually "stipulated . . . that it" had lost all "desire" to reenter the McKee Plan's pharmacy network by force under Tennessee law. Bohannon Decl., R.138-1 at 2116. Yet none of that deterred McKee from expanding the suit to include claims against Tennessee's Insurance Commissioner, Carter Lawrence. *See* Am. Compl., R.83 at 1066. And ultimately, McKee sought summary judgment on a claimed right to

12

equitable relief against Commissioner Lawrence's hypothetical future enforcement of Tennessee's pharmacy-networking laws. *See* McKee Mot. Summ. J., R.118 at 1538.

***The District Court's Decision.*** McKee's summary judgment motion focused on a cluster of "Pharmacy Inclusion Laws" through which Tennessee prohibits discrimination against pharmacies with respect to the "terms and conditions" of networking. Tenn. Code Ann. § 56-7-3121(a); *see id.* §§ 2359(a), 3121(b). To be clear, these laws do not prevent the network maker — PBM or otherwise — from setting whatever terms and conditions of participation it wants. But once the terms and conditions are set, any pharmacy "willing to accept" them must be allowed to participate in the network. *Id.* § 3121(a); *see id.* §§ 2359(a)(1), 3121(b). And the network manager cannot undermine such inclusion by giving special perks to a subset of network pharmacies. *See id.* §§ 2359(e), 3120, 3121(c). In short, the Pharmacy Inclusion Laws use complex language to do something simple: they dictate the equal treatment of pharmacies to tamp down on anti-competitive networking practices.

When it came time to address cross motions for summary judgment, however, the record did not permit any meaningful adjudication of

13

Tennessee's Pharmacy Inclusion Laws. To be sure, Thrifty once thought these laws would allow it to reenter the McKee Plan's pharmacy network. *See* Thrifty Consumer Compls., R.35-1 at 179–89. But Thrifty had since abandoned that effort. *See* Bohannon Decl., R.138-1 at 2116. And now, there was nothing to indicate Commissioner Lawrence had any basis or intention to take adverse action against McKee, MedImpact, or the Plan in connection with Thrifty's administrative complaints. *See* McKee Summ. J. Reply, R.139 at 2137–41.

The district court nevertheless granted McKee summary judgment and saddled Commissioner Lawrence with a permanent injunction. *See McKee Foods Corp. v. BFP Inc.*, No. 1:21-cv-279, 2025 WL 968404 (E.D. Tenn. Mar. 31, 2025); Opinion & Order, R.142; Judgment, R.143. It reasoned that the Pharmacy Inclusion Laws were "prohibit[ing] McKee and [MedImpact] from . . . incentivizing" McKee employees "to use specific pharmacies." *McKee*, 2025 WL 968404, at *4. And it thought McKee was breaking those laws in a way that had nothing to do with Thrifty. Specifically, McKee had recently opened a "company-owned pharmacy" where its employees could "pay substantially lower copays." *Id.* at *6. And since "[t]his practice ha[d] already resulted in the filing of at least

14

one administrative complaint against [MedImpact]," the district court thought it gave rise to a live, justiciable controversy between McKee and Commissioner Lawrence. *Id.*

Then, after wholly reinventing McKee's cause of action for summary judgment purposes, the district court abandoned all discussion of the McKee Foods Family Pharmacy in favor of a more sprawling ERISA preemption analysis. That is, instead of determining whether ERISA somehow gave McKee (or its corporate subsidiary) a license to run the company-owned pharmacy, the district court asked whether ERISA preempted *all* of Tennessee's Pharmacy Inclusion Laws in the abstract. *See id.* at *8. The court then reached the sweeping conclusion that these laws "ha[d] an impermissible 'connection with' ERISA plans" and "declare[d]" them "invalid as applied [*not*] to" McKee itself but to any "self-funded [ERISA] plan." *Id.* at *9, *14 (emphasis omitted). To accompany this abstract declaration, the district court "permanently enjoined" Commissioner Lawrence "from enforcing" any of the Pharmacy Inclusion Laws "against" (not McKee, but) "[the McKee] Plan," including "indirect enforcement against" (the nonparty) MedImpact "for actions" it might someday "take[] on the [McKee] Plan's behalf." *Id.* (emphasis omitted).

15

Commissioner Lawrence timely appealed to challenge these faulty premises and far-reaching conclusions. *See* Notice, R.145 at 2255. This Court should now reverse for the reasons given below.

## ARGUMENT SUMMARY

This Court reviews grants of summary judgment de novo. *Thiokol*, 76 F.3d at 754. It reviews grants of equity relief only for abuse of discretion. *See Schmitt v. LaRose*, 933 F.3d 628, 637 (6th Cir. 2019); *Travelers Indem. Co. v. Bowling Green Pro. Assocs., PLC*, 495 F.3d 266, 271 (6th Cir. 2007). But here, the judgment and relief both rest on multiple "legal mistake[s]." *Digital Media Sols., LLC v. S. Univ. of Ohio, LLC*, 59 F.4th 772, 777 (6th Cir. 2023). *First*, the district court misconceived the extent of justiciable dispute between McKee and Commissioner Lawrence, leading to a merits analysis of unwarranted scope. *Second*, the district court erred within that analysis by misapplying ERISA preemption law. *Finally*, the district court compounded the prior two errors by issuing injunctive and declaratory relief through which it purported to settle the rights of nonparties in connection with future, hypothetical scenarios. Each error would alone be sufficient to justify reversal in this case.

16

## ARGUMENT

### I.    McKee lacks a justiciable claim to equitable relief.

"The oldest and most consistent thread in the federal law of justiciability is that the federal courts will not grant advisory opinions." *Boyle v. Anderson*, 68 F.3d 1093, 1100 (8th Cir. 1995) (quoting *Flast v. Cohen*, 392 U.S. 83, 96–97 (1968)).  Yet that is exactly what McKee has sought through its claims against Commissioner Lawrence.  In indulging McKee's request, the district court committed two principal errors: (1) it over-expanded ERISA's private right of action, and (2) it over-read the evidence offered to establish a justiciable controversy.

### A.    McKee's claimed ERISA right of action provides it no pathway to court-ordered relief.

The district court's first mistake was attempting to adjudicate claims for which ERISA provides no right of action.  Standing means little in a suit brought to enjoin a government official if the plaintiff has no substantive right to seek pre-enforcement relief.  *See Crugher v. Prelesnik*, 761 F.3d 610, 614–15 (6th Cir. 2014); *Potter v. Hughes*, 546 F.3d 1051, 1055 (9th Cir. 2008) (citing *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 465 n.13 (1974)); *see also Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979) (distinguishing between standing and

17

right of action); *Keen v. Helson*, 930 F.3d 799, 802 (6th Cir. 2019) (same). The Declaratory Judgment Act "does not create" such a right. *Littler v. Ohio Ass'n of Pub. Sch. Emps.*, 88 F.4th 1176, 1180 n.1 (6th Cir. 2023) (quoting *Davis v. United States*, 499 F.3d 590, 594 (6th Cir. 2007)). And although McKee invokes a right to sue provided by ERISA, that right cannot support McKee's claims in this case.

ERISA's text confers a right to sue for equitable relief on plan "participant[s], beneficiari[es], [and] fiduciar[ies]." 29 U.S.C. § 1132(a)(3), *cited by* McKee Summ. J. Reply, R.139 at 2146. The right does not extend to ERISA-plan "sponsor[s]," which appears to be the primary "capacit[y]" in which McKee seeks to sue. McKee Summ. J. Reply, R.139 at 2138. McKee has illustrated this by focusing on its "right as plan sponsor" to "design and structure its ERISA plan in the manner it [deems] appropriate." *Id.* at 2140; *see id.* at 2138–41. And were McKee to lodge its grievances as a fiduciary, it could not claim the prerogative to "design" or "structure . . . ERISA plan" benefits. *Id.* at 2138; *see supra* at 9–10.

Moreover, to the extent McKee does intend to sue as an ERISA fiduciary, it may not couch its right to relief in the doctrine of federal preemption. ERISA fiduciaries can indeed bring "civil action[s]" to

18

"enjoin any act[s] or practice[s] which violate[]" ERISA. 29 U.S.C. § 1132(a)(3) (emphasis added); *see Coyne*, 98 F.3d at 1466. But McKee has offered no sound theory as to how Commissioner Lawrence would "violate[]" ERISA by enforcing state law. 29 U.S.C. § 1132(a)(3). McKee has claimed only that ERISA supersedes Tennessee law, at least in certain applications. *See McKee*, 2025 WL 968404, at *3. But just because a state law's application may at times be preempted does not mean its enforcement "violates" ERISA. 29 U.S.C. § 1132(a)(3).

This is because preemption flows from the Supremacy Clause, which is decidedly "not the 'source of any federal rights.'" *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015) (quoting *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 107 (1989)). So a preemption case is unlike a suit brought to vindicate enumerated rights or otherwise enforce individual-rights-creating limits on "state action." *Lindke v. Freed*, 114 F.4th 812, 816 (6th Cir. 2024). Instead, a pre-enforcement preemption claim must rest on the assertion that federal law would "supersede" state law in some discrete and impending enforcement circumstance. 29 U.S.C. § 1144(a); *see Ammex, Inc. v. Cox*, 351 F.3d 697, 706–07 (6th Cir. 2003). And even in that circumstance, preemption

19

would have to be McKee's defense of last resort.  *See Torres v. Precision Indus., Inc.*, 938 F.3d 752, 754 (6th Cir. 2019).

To say that a state agent "violates" ERISA in enforcing state law thus stretches the term "violate[]" beyond its tethers.  29 U.S.C. § 1132(a)(3).  A person "violat[es]" a law by "breach[ing] . . . duties" or flouting prohibitions that confer legal "right[s]" on others.  *Violation*, Black's Law Dictionary (rev'd 4th ed. 1968).  But the Supremacy Clause confers no such "rights," *Armstrong*, 575 U.S. at 324 (quoting *Golden State*, 493 U.S. at 107), and ERISA does not saddle States with such prohibitions, *see* 29 U.S.C. § 1144(a).  Instead, ERISA imposes duties — mainly on fiduciaries — the breach of which can be "redress[ed]" through ERISA's private right of action.  *Id.* § 1132(a)(3); *see supra* at 10.  But that does not mean a state officer can violate ERISA in the same way as one violates "rights . . . secured by" the Bill of Rights or the Fourteenth Amendment.  42 U.S.C. § 1983.

The district court likewise erred by attempting to justify this lawsuit purely on the notion that it "serve[s] a critical purpose."  *McKee*, 2025 WL 968404, at *7.  And the court erred further by invoking *Shaw v. Delta Air Lines*, 463 U.S. 85 (1983), as somehow supporting McKee's claimed

20

right to sue. *See McKee*, 2025 WL 968404, at \*7; *see also* McKee Summ. J. Resp., R.135 at 2031–32 (invoking *Shaw* and its progeny). *Shaw* no doubt establishes that this case "presents a federal question." 463 U.S. at 96 n.14. But *Shaw* does not hold that ERISA's text grants "an independent [right] of action" allowing ERISA fiduciaries — much less sponsors — to sue state officers for pre-enforcement relief. *Littler*, 88 F.4th at 1180 n.1 (quoting *Davis*, 499 F.3d at 594); *see Chase Bank USA, N.A. v. City of Cleveland*, 695 F.3d 548, 554 n.4 (6th Cir. 2012).

No court can invent such a right out of whole cloth to further the "critical purpose" served by pre-enforcement litigation. *McKee*, 2025 WL 968404, at \*7. Instead, pre-enforcement challenges generally require a right of action created by Congress. *See Armstrong*, 575 U.S. at 327; *Crugher*, 761 F.3d at 614–15. Although McKee has identified such a right here, it neither belongs to plan sponsors nor runs against state officers. *See supra* at 18. On account of those critical oversights, McKee was ineligible to receive summary judgment.

### B.    To the extent ERISA permits suit, McKee has failed to properly establish the jurisdictional prerequisites.

Even assuming McKee invoked a proper substantive right to sue, McKee still failed to meet its obligation to establish the district court's

jurisdiction. Every plaintiff must bear this additional burden, even when pursuing "a valid [right] of action." *Soehlen v. Fleet Owners Ins. Fund*, 844 F.3d 576, 581 (6th Cir. 2016); *see Jude v. Comm'r of Soc. Sec.*, 908 F.3d 152, 157 (6th Cir. 2018). And yet, on multiple fronts, McKee failed to show the prerequisites for a federal lawsuit here.

The jurisdictional doctrines of standing, ripeness, and sovereign immunity all present obstacles to McKee. Collectively, they require that pre-enforcement lawsuits present the "concrete context . . . afforded by an enforcement action." *Ammex*, 351 F.3d at 706–07. To evade sovereign immunity, the plaintiff must sue the officer with "statutory authority" to enforce the challenged legal provision. *Child.'s Healthcare is Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1415 (6th Cir. 1996) (quoting *Ohio v. Madeline Marie Nursing Homes*, 694 F.2d 449, 459 n.9 (6th Cir. 1982)); *see Ostrewich v. Tatum*, 72 F.4th 94, 100 (5th Cir. 2023); *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022); *Doyle v. Hogan*, 1 F.4th 249, 255 (4th Cir. 2021). And to establish standing and a ripe justiciable controversy, the plaintiff must show some discrete use of that authority against him is imminent. *See Christian Healthcare Ctrs., Inc. v. Nessel*,

22

117 F.4th 826, 843 (6th Cir. 2024); *Friends of George's, Inc. v. Mulroy*, 108 F.4th 431, 435 (6th Cir. 2024); *Ammex*, 351 F.3d at 707–08.

In practice, this means McKee must meet two basic requirements: To start, McKee must say *how* it intends to violate specific "provisions" of the Pharmacy Inclusion Laws. *Doe v. Lee*, 102 F.4th 330, 341 (6th Cir. 2024). Then, McKee must explain *why* it has reasonable cause to fear "a '*certainly impending*' threat of prosecution" for doing so. *Friends*, 108 F.4th at 435 (quoting *Crawford v. U.S. Dep't of Treasury*, 868 F.3d 438, 454 (6th Cir. 2017)). The district court thought McKee's operation of a "company-owned pharmacy" met those predicates. *McKee*, 2025 WL 968404, at *6. But adopting that as its basis for jurisdiction produced three critical errors.

*First*, McKee did not offer its operation of a "company-owned pharmacy" as the foundation for its claims *either* when it sued Thrifty *or* when it sued Commissioner Lawrence. In fact, McKee's pharmacy did not even "open[]" until "December 2022," more than a year after McKee filed suit. Jolls Decl., R.118-1 at 1545; *see* Compl., R.1 (filed November 2021). And the amended complaint from June 2024 makes no mention of McKee's pharmacy either. *See* Am. Compl, R.83. It thus follows that, "as of the

23

time [either] complaint w[as] filed," McKee's pharmacy was not the locus of its claims. *Christian Healthcare*, 117 F.4th at 849 (quoting *Ohio v. Yellen*, 53 F.4th 983, 994 (6th Cir. 2022)). And that made it improper for the district court "to retroactively generate standing" to support summary judgment on this novel and newly discovered basis. *Id.*

*Second*, the district court failed to vet this basis for suit by considering all the requirements of a pre-enforcement challenge. It is one thing to say McKee's pharmacy operation arguably violates Tennessee law; it is another thing to say McKee's fear of repercussion stems from objective facts rather than "feel[ings]." *Younger v. Harris*, 401 U.S. 37, 42 (1971); *see Christian Healthcare*, 117 F.4th at 843; *Ammex*, 351 F.3d at 707. And here, the summary judgment record did not show "a '*certainly impending*' threat of prosecution" related to McKee's operation of its pharmacy. *Friends*, 108 F.4th at 435 (quoting *Crawford*, 868 F.3d at 454).

On the contrary, the district court relied solely on "the filing of . . . one administrative complaint" wherein another Tennessee pharmacy accused *MedImpact* of breaking the law. *McKee*, 2025 WL 968404, at *6 (citing Preferred Cherokee Compl., R.119-9). And just as with the complaints filed by Thrifty, the record contains no inkling that Commissioner

24

Lawrence was planning to use his "statutory authority" against McKee. *Deters*, 92 F.3d at 1415 (quoting *Madeline Marie*, 694 F.2d at 459 n.9). In fact, the district court identified nothing in the record that would indicate Commissioner Lawrence has any interest in stopping McKee from "incentiviz[ing]" its employees to use the company pharmacy. Tenn. Code Ann. § 56-7-3120(b)(2); *see McKee*, 2025 WL 968404, at *6. And that is despite the pharmacy having operated for more than two years prior to the summary judgment decision. *See* Jolls Decl., R.118-1 at 1545.

*Third*, and most importantly, the district court failed to appropriately cabin its merits analysis to fit its theory of jurisdiction. If the co-pays offered at McKee's pharmacy provide the "concrete context" that grounds this lawsuit, McKee's claims are still only justiciable to the extent they remain grounded in that controversy. *Ammex,* 351 F.3d at 706. That is, there must be a throughline running from McKee's conduct, through the provision that bars it, to Commissioner Lawrence. *Lee*, 102 F.4th at 341–42. And only via that throughline can a court provide "party-specific and injury-focused" relief. *L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 415 (6th Cir. 2023).

25

This Court, its sister circuits, and the Supreme Court have reiterated this point in countless recent opinions. Federal judges may not "'lawfully enjoin the world at large' or purport to enjoin challenged 'laws themselves.'" *Whole Woman's Health v. Jackson* (*Jackson II*), 595 U.S. 30, 44 (2021) (citation omitted) (quoting *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832 (2d Cir. 1930) and *Whole Woman's Health v. Jackson* (*Jackson I*), 141 S. Ct. 2494, 2495 (2021)). And "the Declaratory Judgment Act . . . does not modify the constitutional standards of jurisdiction" or transform federal judges into general advisors on all matters of federal law. *Lee*, 102 F.4th at 342; *see Mikel v. Quin*, 58 F.4th 252, 259 (6th Cir. 2023); *Doe v. Duling*, 782 F.2d 1202, 1205 (4th Cir. 1986). It follows that the district court should have asked only whether Commissioner Lawrence could prosecute McKee for offering lower copays at its company-owned pharmacy. The court had no basis to address an "abstract dispute" about whether a cluster of statutory provisions are preempted by ERISA in general. *Fialka-Feldman v. Oakland Univ. Bd. of Trs.*, 639 F.3d 711, 714 (6th Cir. 2011); *see Lee*, 102 F.4th at 341–42.

Yet after asserting the existence of a controversy over *one* provision of the Pharmacy Inclusion Laws, the district court proceeded to assess

26

the validity of *all* "[t]he challenged provisions" together.  *McKee*, 2025 WL 968404, at \*7; *see id.* at \*8–10.  This led to a largely academic discussion of how Tennessee's laws generally impact ERISA plan "structure[]" and benefits "design[]."  *Id.* at \*9.  But it notably did *not* lead to a discussion about McKee's purported right to operate a pharmacy in its capacity as ERISA-plan sponsor or ERISA fiduciary.  *See id.* at \*8–10.

This lawsuit's meandering path helpfully illustrates the problems that attend this free-wheeling conception of equity power.  This case started as a dispute about whether McKee or MedImpact could refuse to do business with Thrifty.  *See BFP*, 2024 WL 1213808, at \*1–2.  It then shifted to a dispute about whether Commissioner Lawrence could force McKee to do business with Thrifty.  *See* Am. Compl., R.83 at 1080–81; *McKee*, 2025 WL 968404, at \*5.  It then somehow became a dispute about the "substantially lower copays" offered by McKee at its company-owned pharmacy.  *Id.* at \*6 (citing Tenn. Code Ann. § 56-7-3120(b)(2)).  And the district court's solution was to "declare" multiple entire sections of Tennessee code "preempted by ERISA."  *Id.* at \*14 (emphasis omitted).

That does not constitute a proper application of Article III, which creates a judicial branch of the federal government for the sole purpose

27

of settling live legal "'Cases' and 'Controversies.'" *Safety Specialty Ins. v. Genesee Cnty. Bd. of Comm'rs*, 53 F.4th 1014, 1020 (6th Cir. 2022) (quoting U.S. Const. art. III, § 2, cl. 1). Nor did the district court observe the limits placed on federal court jurisdiction by the States' long-recognized "immunit[y] from suit." *Ernst v. Rising*, 427 F.3d 351, 358 (6th Cir. 2005). Instead, it issued "an advisory interpretation" of ERISA coupled with "an advisory injunction." *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 536 (6th Cir. 2021). This alone provides sufficient basis to reverse the decision below. *See Lee*, 102 F.4th at 342.

## II.   ERISA does not preempt the Pharmacy Inclusion Laws.

If this Court reaches the merits, it should still reject the district court's preemption analysis. The States "serve as . . . 'laborator[ies] of democracy' in the realm of health care" and prescription-drug insurance. *Boyle*, 68 F.3d at 1109. And recognizing this, the ERISA jurisprudence affords "due respect to 'the fundamental principle of comity between federal courts and state governments.'" *Thiokol*, 76 F.3d at 755 (quoting *Fair Assessment in Real Estate Ass'n, Inc. v. McNary*, 454 U.S. 100, 103 (1981)); *see Coyne*, 98 F.3d at 1467, 1469 n.14. Federal courts must therefore presume that state laws regulating pharmacy matters operate in a

28

"separate sphere[]" alongside ERISA. *Boyle*, 68 F.3d at 1099 (quoting *Alessi v. Raybestos-Manhattan*, 451 U.S. 504, 522 (1981)); *see Cal. Div. of Labor Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 325 (1997); *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins.*, 514 U.S. 645, 654–55 (1995); *Golden Gate*, 546 F.3d at 648. And McKee has failed to overcome that presumption in this lawsuit.

## A.    The challenged laws do not concern ERISA's purview.

By its explicit terms, "ERISA supersedes state laws that 'relate to [ERISA] plan[s].'" *Thiokol*, 76 F.3d at 754 (quoting 29 U.S.C. § 1144(a)). And federal courts have recognized "two related methods [for] determining the fundamental question" of whether this language applies to a particular state law. *Id.* at 758. *First*, courts ask "whether [the state law] refer[s] to [ERISA] plan[s]" in the sense of directly targeting them for special regulation. *Id.* *Second*, courts ask whether the state law "ha[s] some connection with [ERISA] plan[s]" in the sense that it dictates plan administration or substantive benefits. *Id.* Here, Tennessee's Pharmacy Inclusion Laws do not "relate to" ERISA in either manner.

### 1.    The laws do not target employee-benefit plans.

The Pharmacy Inclusion Laws do not "'refer to' ERISA plans" in the way precedent employs that term. *Id.* at 759. Counterintuitive as it may

29

seem, a law's "mere reference" to "covered plans[s]" is not enough to support this theory of preemption. *Id.* at 758; *see Chambers*, 903 F.3d at 847 (citing *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319–20 (2016)); *NYS Health Maint. Org. Conf. v. Curiale*, 64 F.3d 794, 799 n.15 (2d Cir. 1995). Instead, "an impermissible 'reference to' an ERISA plan" exists only "'[w]here a State's law acts immediately and exclusively upon ERISA plans" or "the existence of ERISA plans is essential to the [state law's] operation." *Rowe*, 429 F.3d at 303 (quoting *Dillingham*, 519 U.S. at 325). In other words, a state law must *target* ERISA plans for special treatment, not just subject them to "general[ly] applicab[e]" rules. *Coyne*, 98 F.3d at 1469; *see Thiokol*, 76 F.3d at 758, 760–61. And Tennessee's Pharmacy Inclusion Laws do the latter, not the former.

This is because the Pharmacy Inclusion Laws "appl[y] to health [insurance] plans that are not covered by ERISA, as well as those at are." *Thiokol*, 76 F.3d at 755; *see* Tenn. Code Ann. § 56-7-3102(1)(A). And these laws "do[] not depend on ERISA in any way," but instead apply "whether the" prohibited networking practices "involve[] an ERISA plan or a run-of-the-mill [drug] insurance policy." *Coyne*, 98 F.3d at 1471; *see Rowe*, 429 F.3d at 304. For these reasons, the Pharmacy Inclusion Laws

30

"constitute[] . . . law[s] of general application," which do not qualify for preemption by "reference." *Rowe*, 429 F.3d at 304 (quoting *Carpenters Loc. Union No. 26 v. U.S. Fid. & Guar. Co.*, 215 F.3d 136, 144–45 (1st Cir. 2000)); *see Boyle*, 68 F.3d at 1101.

Nor does it matter that ERISA plans were made subject to these laws by "amend[ment]." McKee Summ. J. Resp., R.135 at 2044. The "undisputed . . . intent" of those amendments was to "*include* ERISA plans within the coverage" of generally applicable rules. *Id.* (emphasis added). In fact, the statutes' history of revision only goes to show that "[t]he existence of ERISA plans is not at all essential to" these laws' operation. *Rowe*, 429 F.3d at 304. "If the reference to [ERISA] plans was deleted from" these laws, they "would still be operable" as they were prior to amendment. *Id.* This means Tennessee's legislature was doing the *opposite* of "singl[ing] out ERISA . . . plans for different treatment." *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 830 (1988). Reference-based preemption cannot follow from an effort to make "general[ly] applicab[e]" regulations *more* "general[ly] applicabl[e]." *Coyne*, 98 F.3d at 1469; *see Boyle*, 68 F.3d at 1101.

31

### 2. The laws do not compel employers to provide any substantive benefits.

Because the Pharmacy Inclusion Laws "make[] no specific reference to . . . ERISA plan[s]," the next question is whether they "ha[ve] any connection with" such plans that is "more than . . . tenuous, remote, or peripheral." *Thiokol*, 76 F.3d at 761. Again, the answer is no.

Courts use the "connection with" theory of preemption to root out state laws that "bind employers or plan administrators to particular choices" regarding substantive benefits or "administrative practice[s]." *Coyne*, 98 F.3d at 1468 (citing *Travelers*, 514 U.S. at 659); *see Rutledge*, 592 U.S. at 86–87. Thus, "[a] law is connected impermissibly to ERISA plans if it has 'an effect on . . . primary [plan] functions'" like the determination of "'benefit . . . amount[s]'" or beneficiary "'eligibility.'" *Curiale*, 64 F.3d at 801 (quoting *Aetna Life Ins. v. Borges*, 869 F.2d 142, 146–47 (2d Cir. 1989)); *see Rutledge*, 592 U.S. at 86–87. But "it is important to remember that . . . logic [and] practicality" limit the scope of this theory. *Thiokol*, 76 F.3d at 755. At bottom, the point is simply to protect the substantive "terms and conditions of [ERISA] plans" from dictation by state law. *Chambers*, 903 F.3d at 849 (quoting *Lane v. Goren*, 743 F.2d 1337, 1339 (9th Cir. 1984)).

32

This means that "creating inefficiencies alone is not enough to trigger ERISA pre-emption," so a state law that "merely affects [the] costs" of providing benefits will still be enforceable, ERISA notwithstanding. *Rutledge*, 592 U.S. at 87, 91.  Indeed, state law reaches innumerable matters that can and do "alter" the "incentives" of providing employee fringe benefits.  *Id.* at 88; *see SIIA II*, 827 F.3d at 558–59 & n.3; *De Buono*, 520 U.S. at 815; *Firestone Tire & Rubber Co. v. Neusser*, 810 F.2d 550, 555 (6th Cir. 1987).  But "ERISA . . . does not 'create a state-law-free zone around everything that affects an ERISA plan.'"  *SIIA II*, 827 F.3d at 555 (quoting *Associated Builders*, 543 F.3d at 284).  Valid exercises of state police power will inevitably "cause[] some disuniformity in plan administration" and push employers "to limit benefits or charge plan members higher rates."  *Rutledge*, 592 U.S. at 87, 91.  Yet nothing in ERISA gives employers, ERISA plans, or plan agents a blanket immunity from state law.  *See Rowe*, 429 F.3d at 303; *Custer*, 89 F.3d at 1167–68.

Instead, ERISA "connection with" preemption simply avoids a situation where plans must "keep certain records in some States but not in others; . . . make certain benefits available in some States but not in others; . . . process claims in a certain way in some States but not in others;

[or] comply with certain fiduciary standards in some States but not in others." *Fort Halifax*, 482 U.S. at 9. When state law stops short of imposing such direct administrative burdens or otherwise "forcing plans to adopt any particular . . . substantive coverage," it will not be preempted for having an impermissible connection with ERISA plans. *Rutledge*, 592 U.S. at 88; *see Travelers*, 514 U.S. at 656–57 (citing *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990)).

Here, the Pharmacy Inclusion Laws fall short of "requir[ing] any employer to provide specific [substantive] benefits." *Golden Gate*, 546 F.3d at 655. To be clear, courts use the terms "substantive coverage" or "substantive benefit" to describe aspects of an ERISA plan that remunerate employees. *See Rutledge*, 592 U.S. at 88; *Gobeille*, 577 U.S. at 320; *Fort Halifax*, 482 U.S. at 9. And in the context of prescription-drug programs, that most naturally refers to the formulary: the pre-agreed list of drug products the insurer has agreed to help purchase. *See supra* at 5. But the laws at issue here do not in any way dictate the contents of formularies. *See* Tenn. Code Ann. §§ 56-7-2359, 3120, 3121. Nor do they prevent the construction of pharmacy networks — or even dictate what pharmacies must be included in such networks. *See id.*

34

Instead, the Pharmacy Inclusion Laws simply require that the "terms and conditions" of network participation be applied to all pharmacies equally. *Id.* § 56-7-3121(a); *see id.* §§ 2359(a)(1), 3121(b). So in no way is any insurer — ERISA plan or otherwise — being told what "conditions" must be "covered" or what "types" of drugs must be made "available." *Washington Physicians Serv. Ass'n v. Gregoire*, 147 F.3d 1039, 1047 (9th Cir. 1998). On the contrary, the "cover[ed]" drugs will be the same regardless of what pharmacy sells them. *Rutledge*, 592 U.S. at 88; *see supra* at 5. And the Pharmacy Inclusion Laws take aim only at a common insurance-industry "practice[]" that (ostensibly) reduces the cost of covering such drugs. *Rowe*, 429 F.3d at 303 (quoting *PCMA v. Rowe,* No. CIV.03-153, 2005 WL 757608, at *7 (D. Me. Feb. 2, 2005)).

Nothing in the record even indicates that these laws will "cause [ERISA] plans to pay" higher prices for drugs "already covered under" their formularies. *Boyle*, 68 F.3d at 1103. And that makes sense, because drug pricing is generally a "condition" of network participation that network-makers remain free to set and apply to all pharmacies. Tenn. Code Ann. § 56-7-3121(a); *see supra* at 7. But even if these laws made it more expensive for ERISA plans to provide prescription-drug coverage, it

35

would make no difference to the preemption analysis. "ERISA's preemption" does not "reach state actions which impact only . . . the relative costs" of providing substantive coverage. *Curiale*, 64 F.3d at 804. And Tennessee's laws "do[] not require [ERISA] plans" or other insurers "to provide any particular [drug] to any particular beneficiary in any particular way." *Rutledge*, 592 U.S. at 90; *see Rowe*, 429 F.3d at 303.

This Court's decision in *Kentucky Association of Health Plans, Inc. v. Nichols*, 227 F.3d 352 (6th Cir. 2000), does not hold otherwise — much less support the blanket preemption of all pharmacy-networking laws. *But see* McKee Summ. J. Br., R.119 at 1631; McKee Summ. J. Reply, R.139 at 2149–50. The question in *Nichols* was whether Kentucky could prohibit health maintenance organizations, or "HMOs," from "discriminat[ing] against" healthcare providers "willing to meet the . . . conditions for participation" in their networks. 227 F.3d at 355; *see Ky. Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329, 332 (2003). And this Court answered *yes*: such laws were explicitly saved from ERISA preemption because they "regulate[d] insurance." 227 F.3d at 364 (citing *Gregoire*, 147 F.3d 1045–46); *see* 29 U.S.C. § 1144(b)(2)(A); *see also Miller*, 538 U.S. at 334–42 (affirming on this basis). Yet despite this result, McKee has

36

invoked *Nichols* for its discussion of "connection with" preemption. *See* McKee Summ. J. Br., R.119 at 1631. And in so doing, McKee has failed to recognize that discussion as "[d]ictum [that] settles nothing" in this case. *Jama v. ICE*, 543 U.S. 335, 351 n.12 (2005).

Indeed, just because a court says something does not make that something the law. *See Haddad v. Alexander, Zelmanski, Danner & Fioritto, PLLC*, 758 F.3d 777, 781 (6th Cir. 2014). Instead, when a court makes statements "[un]necessary to" a case's "outcome," it goes beyond its purview to establish binding precedent. *Id.*; *see Wright v. Spaulding*, 939 F.3d 695, 700 (6th Cir. 2019) (citing *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821)); *Freed v. Thomas*, 976 F.3d 729, 738 (6th Cir. 2020); *see also Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010) (explaining dicta). And in *Nichols*, application of ERISA's savings clause made it "[un]necessary to" discuss other aspects of preemption. *RLR Invs., LLC v. City of Pigeon Forge*, 4 F.4th 380, 390 n.4 (6th Cir. 2021) (quoting *Freed*, 976 F.3d at 738). That is, it "ma[d]e no difference to the parties" whether Kentucky's laws related to ERISA plans because they were not preempted anyway. *Wright*, 939 F.3d at 700. So although the *Nichols* court failed to employ "the hallmark language of dicta," the

37

fact is "it easily could" have. *Firexo, Inc. v. Firexo Grp. Ltd.*, 99 F.4th 304, 325 (6th Cir. 2024). It held Kentucky's laws were not preempted even "assuming" they related to ERISA plans. *Id.*

Moreover, even if the *Nichols* court's preemption analysis reflects the law of this Circuit, *Nichols* would still be factually distinguishable from McKee's case due to the nature of prescription-drug insurance. To understand why, look at HMOs. "The . . . distinction between an HMO . . . and a traditional [healthcare] insurer is that the HMO provides medical services" to its members "*directly.*" *Gregoire*, 147 F.3d at 1045 (emphasis added). So where a traditional insurer will help you pay for *your* doctor, an HMO will allow you to visit one of *its* doctors. *See, e.g.*, *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 360–61 & n.1 (2002). HMOs thus act as healthcare insurers by assuming the risk that their members will need a doctor. *Express Scripts, Inc. v. Wenzel*, 262 F.3d 829, 835 (8th Cir. 2001). And under those facts, it is easy to see how the HMO's selection of "contract[ed network] physicians" goes to the substance of coverage provided. *Rush Prudential*, 536 U.S. at 360.

Indeed, certain "provider[s]" of medical services may be seen as "better qualified for treatment of a specific illness or accident." *Stuart*

38

*Circle Hosp. Corp. v. Aetna Health Mgmt.*, 995 F.2d 500, 504 (4th Cir. 1993).  Courts have therefore reasonably concluded that "[t]he freedom to choose a treating physician is inextricable from the nature of [health insurance] coverage."  *Blue Cross & Blue Shield of Kan. City v. Bell*, 798 F.2d 1331, 1335 (10th Cir. 1986).  "[T]he essence of . . . coverage" includes not just the healthcare services paid for but also the choice of who provides them.  *Id.*  And that is why *Nichols* held that Kentucky's HMO networking laws "regulate[d] insurance" and were saved from ERISA preemption.  227 F.3d at 364.

But visiting the doctor is different from visiting the pharmacist, and that makes *Nichols* different from this case.  Whereas physicians near-exclusively provide personalized healthcare services, pharmacies generally dispense identical prescription-drug products.  *Cf. Saltzman*, 384 F. App'x at 109–10 (discussing coverage for an FDA-approved drug product called Plavix and its generic competitors).  More to the point, prescription-drug insurers *treat* pharmacies as mere retailers of drugs "list[ed] . . . on [a] formulary."  *J.B.D.L.*, 485 F.3d at 884; *see Saltzman*, 384 F. App'x at 109–10; *supra* at 5.  The drugs on the formulary will be the same drugs regardless of what pharmacy provides them.  *See Saltzman*, 384 F.

39

App'x at 109 n.4.  So again, the substance or "scope" of prescription-drug

"benefits" derives from the formulary, not the network of pharmacies.  *Id.*

at 113; *see J.B.D.L.*, 485 F.3d at 884; *see supra* at 5.  As a result, *Nichols*

does not dictate the preemption discussion here — either as a matter of

precedent or by way of analogy.

For similar reasons, McKee cannot carry its argument by pointing

to the Tenth Circuit's decision in *PCMA v. Mulready*, 78 F.4th 1183 (10th

Cir. 2023).  *See* McKee Summ. J. Br., R.119 at 1632–33.  *Mulready* all but

assumes the errant conclusion that "pharmacy network[s]" are as much

a part of "prescription-drug-benefit design" as are the composition of "for-

mular[ies]."  78 F.4th at 1188, 1197.  It even cites *Nichols* for the broad

proposition that all "any willing provider" laws are "impermissibly con-

nected with ERISA plans."  *Id.* at 1197.  But that is not what *Nichols*

holds — or even what *Nichols* says.  *See supra* at 36–39.  And *Mulready*'s

analysis does not to engage with the meaningful distinction between

choosing "a treating physician" and choosing a pharmacy as a prescrip-

tion-drug retailer.  *Bell*, 798 F.2d at 1335.

That distinction matters in this case because it goes to the heart of

McKee's theory that the Pharmacy Inclusion Laws are so "connected

with" ERISA plans as to trigger ERISA preemption. *See supra* at 38–40. State laws have no connection with ERISA plans unless they "bind employers or plan administrators to particular choices" regarding substantive benefits. *Coyne*, 98 F.3d at 1468 (citing *Travelers*, 514 U.S. at 659); *see Rutledge*, 592 U.S. at 86–87. And because pharmacy networking is just a cost-cutting measure, Tennessee's Pharmacy Inclusion Laws avoid preemption under this standard.

## B.   The challenged laws do not frustrate ERISA's aims.

As a fallback to express preemption, McKee has also claimed that ERISA *implicitly* preempts the pharmacy-inclusion laws. *See* McKee Summ. J. Br., R.119 at 1636–37. The district court did not adopt McKee's "skeletal" obstacle-preemption argument, *McGrew v. Duncan*, 937 F.3d 664, 669 (6th Cir. 2019); *see McKee*, 2025 WL 968404, at *8–10, and in fact McKee has forfeited the issue through "scant treatment," *Ashford v. Univ. of Mich.*, 89 F.4th 960, 975 (6th Cir. 2024). Regardless, implied preemption provides no alternative basis for affirmance.

Binding precedent does not condone preemption by freewheeling divination of Congress's unstated "goals." McKee Summ. J. Br., R.119 at 1636; *see Kansas v. Garcia*, 589 U.S. 191, 202 (2020) (citing *Chamber of*

41

*Com. of U.S. v. Whiting*, 563 U.S. 582, 599 (2011)).  And this Court has recognized "'[t]he best evidence of'" congressional "'purpose is the statutory text,' . . . not [judicial] speculations."  *Heard v. Strange*, 127 F.4th 630, 636 (6th Cir. 2025) (quoting *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991)).  It follows that "[i]f [a federal] statute contains an express preemption clause," the statute's language "necessarily contains the best evidence of . . . preemptive intent."  *N. Va. Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 493 (4th Cir. 2025).  And McKee appears to acknowledge this by claiming implied preemption based purely on its express preemption "discussion."  McKee Summ. J. Br., R.119 at 1636; *see also* McKee Summ. J. Reply, R.139 at 2152 (similar).

That thin reed cannot support McKee's case.  Only "unmistakably clear [statutory] language" can supersede state law on subjects that States have traditionally regulated.  *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989)).  ERISA contains no such language.  *See supra* Part II.A.  McKee's claim of implied preemption lacks legs.

42

## C.   The challenged laws regulate insurance.

If the Court rejects the arguments above, it should still reverse the district court's decision on account of ERISA's "savings" clause. *See* 29 U.S.C. § 1144(b)(2)(A).  That provision manifests Congress's intent to spare state insurance regulations from ERISA preemption. *See Med. Mut. of Ohio v. deSoto*, 245 F.3d 561, 573 (6th Cir. 2001).  And the Pharmacy Inclusion Laws regulate an "innovative" insurance-industry practice by addressing the construction and maintenance of pharmacy networks. *Gregoire*, 147 F.3d at 1045 (citing *Metro. Life Ins. v. Massachusetts*, 471 U.S. 724, 741 (1985)).  Tennessee's networking regulations can thus be applied to all sorts of companies that engage in pharmacy networking.  And that decidedly includes PBMs — even PBMs that sell their networks and networking services to ERISA plans.

### 1.   Pharmacy networking is an insurance-industry practice subject to state regulation.

The practice of making and maintaining a pharmacy network is insurance-industry conduct subject to state regulation.  Tennessee's Pharmacy Inclusion Laws therefore regulate insurance.

To understand why, go back to the nature of insurance.  At bottom, it is "the business of spreading risk." *Id.* at 1046.  And here, the pertinent

43

risk is the expense of purchasing prescription drugs. *See* Plan Summary, R.118-1 at 1588–1610. Insurers offering protection against that risk use pharmacy networking to reduce the expense of coverage. *See supra* at 6–7. The whole point is to negotiate discounted pricing for drugs in the formulary by steering customers to a subset of pharmacies. *See id.* And in this way, networking "necessarily affects the risk borne by . . . in-sured[s]," as well as the share of that risk assumed by both insurers and their PBMs. *Gregoire*, 147 F.3d at 1046.

In fact, there is no material difference between a principal insurer and a PBM engaged in pharmacy networking. Just as the insurer collects a premium from the insured in exchange for a promise to help purchase drugs, the PBM collects a fee from the insurer in exchange for a promise to help purchase drugs. *See supra* at 6–7. The PBM thus "assumes the financial risk of" purchasing drugs, and the PBM's spread is functionally equivalent to any other insurer's profit margin. *Rush Prudential*, 536 U.S. at 367 (quoting *Pegram*, 530 U.S. at 218–19); *see Caremark*, 474 F.3d at 474–76; *supra* at 6–7. The "steps" PBMs "take . . . to control costs" are thus indistinguishable from those of "other risk-bearing organizations." *Pegram*, 530 U.S. at 219. And pharmacy networking is exactly that: a

44

mechanism for "limit[ing]" the extent of "exposure" to risk. *Rush Prudential*, 536 U.S. at 371; *see supra* at 6–7.

Indeed, the terms of participation in the pharmacy network may ultimately determine whether beneficiaries will receive "pharmacy coverage at all." *Tex. Pharmacy Ass'n v. Prudential Ins. of Am.*, 105 F.3d 1035, 1041 (5th Cir.1997), *abrogated on other grounds by Miller*, 538 U.S. at 341. So whoever employs that mechanism is engaged in "the business of spreading risk," which is to say the business of insurance. *Gregoire*, 147 F.3d at 1046; *see Tex. Pharmacy*, 105 F.3d at 1041. "[T]o conceive of [PBMs] without th[is] insurance element" would be to "ignore the whole purpose of [PBMs]." *Rush Prudential*, 536 U.S. at 367. So PBMs must be engaged in the insurance business when they "wear[] the[] hat" of pharmacy-network "provider." *Corp. Health Ins. v. Tex. Dep't of Ins.*, 215 F.3d 526, 534 (5th Cir. 2000), *abrogated on other grounds by Miller*, 538 U.S. at 341; *see also Cisneros v. UNUM Life Ins. of Am.*, 134 F.3d 939, 946 (9th Cir. 1998) (flagging the Fifth Circuit's abrogated precedent).

This is especially true if pharmacy-network composition is deemed a "substantive" component of "coverage." *Rutledge*, 592 U.S. at 88. *But see supra* Part II.A.2. If true, that would make network construction and

45

maintenance a state-regulated "insurance practice[]," regardless of who does it. *Am. Council of Life Insurers v. Ross*, 558 F.3d 600, 605 (6th Cir. 2009). Federal courts have drawn a similar line with respect to other non-traditional insurers, like HMOs. *See Rush Prudential*, 536 U.S. at 367; *Express Scripts*, 262 F.3d at 834–37; *cf. Dukes,* 57 F.3d at 360–61 (citing and discussing *Lupo v. Human Affairs Int'l, Inc.*, 28 F.3d 269 (2d Cir. 1994)). And by the logic of those decisions, PBM pharmacy networking must be subject to state regulation.

Moreover, deeming pharmacy network composition to be a substantive part of coverage also means that it "confers a [substantive] benefit on insureds," which further brings the Pharmacy Inclusion Laws within the realm of state insurance regulation. *Gregoire*, 147 F.3d at 1046. Specifically, these laws "expand[] the [pharmacy networks] that . . . health carriers" must "provide." *Id.* And by that logic, the challenged laws are indistinguishable from mandatory-benefit laws that have been thoroughly vetted and consistently saved from ERISA preemption. *See, e.g.*, *Metro. Life*, 471 U.S. at 742 & n.18 (collecting cases).

For all these reasons, Tennessee's Pharmacy Inclusion Laws "regulate[] insurance" within the meaning of ERISA. 29 U.S.C.

46

§ 1144(b)(2)(A). "[N]othing in [ERISA] purports to distinguish between traditional and innovative insurance laws." *Metro Life*, 471 U.S. at 741. And even if the Pharmacy Inclusion Laws do not "alter the [drugs] covered by [any] policy," they still "effect . . . risk-spreading" by addressing a common cost-reduction practice. *Gregoire*, 147 F.3d at 1046. In this sense, they are no different from a state "outlaw[ing] deductibles [or] co-payments." *Id.* And by "tak[ing] over" networking from "traditional . . . insurers," PBMs have invited "regulat[ion] as insurers under state law." *Rush Prudential*, 536 U.S. at 372; *see Miller*, 538 U.S. at 338.

### 2. PBMs must comply with state law when they make and maintain pharmacy networks.

Well-settled precedent likewise dictates that PBMs must comply with the Pharmacy Inclusion Laws *even* when they maintain pharmacy networks for ERISA-governed benefit programs. It is nothing new for a company engaged in the risk-management business to try to use ERISA as a shield against state regulation. *See, e.g.*, *Metro. Life*, 471 U.S. at 732. Yet federal courts have consistently denied the existence of a "law-free zone" emanating from ERISA-governed benefit plans. *SIIA II*, 827 F.3d at 555 (quoting *Associated Builders*, 543 F.3d at 284).

47

This is because ERISA's rights, duties, and other terms "turn[] on" a service provider's "function." *Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp.*, 399 F.3d 692, 699 (6th Cir. 2005); *see Custer*, 89 F.3d at 1162; *Coleman v. Nationwide Life Ins.*, 969 F.2d 54, 61 (4th Cir. 1992). So a company selling services to an ERISA plan must comply with the legal rules — state or federal — applicable to the services that it performs. *See Guyan Int'l, Inc. v. Pro. Benefits Adm'rs, Inc.*, 689 F.3d 793, 797–98 (6th Cir. 2012); *Caremark*, 474 F.3d at 471–77. When those services include making discretionary decisions to fulfill a plan's commitments, the company becomes an ERISA fiduciary "to [whatever] extent it exercise[s] . . . discretion[]." *Coyne*, 98 F.3d at 1466; *see Guyan*, 689 F.3d at 798. And when its services are the type performed by an insurer, the company must follow the "state laws that regulate the insurance industry." *Metro. Life*, 471 U.S. at 732; *see Am. Med. Sec., Inc. v. Auto Club Ins. Ass'n*, 238 F.3d 743, 753–54 (6th Cir. 2001).

To be sure, PBMs often claim to be "non-fiduciary service provider[s], charged with performing" purely administrative acts that involve no discretion. *Penny*, 399 F.3d at 700. But that cannot be said of PBMs empowered to set and enforce the "terms and conditions" of

participation in a plan's pharmacy network. Tenn. Code Ann. § 56-7-3121(a); *see id.* §§ 2359(a), 3121(b). Indeed, when traditional insurance companies challenged provider-networking laws, courts held that regulating "the structure of [provider networks]" is an "indirect[]" regulation of "insurance contracts." *Stuart Circle*, 955 F.2d at 503; *see Bell*, 798 F.2d at 1334–36. And when HMOs brought similar challenges, courts confirmed that HMOs could be treated similarly to "insurance companies" and "regulated similarly in degree and substance." *Express Scripts*, 262 F.3d at 834; *see Miller*, 538 U.S. at 333; *Nichols*, 227 F.3d at 364; *Gregoire*, 147 F.3d at 1045–46; *Corp. Health*, 215 F.3d at 536.

That same line of reasoning also dictates that PBMs must comply with Tennessee's insurance laws, even when an ERISA plan purchases access to the PBM's pharmacy network. The scenario is precisely the same as when a plan sponsor buys a group insurance policy, thereby subjecting itself to "indirect" state insurance "regulation." *Metro. Life*, 471 U.S. at 747. The difference is not of kind — it is only a matter of degree. And recognizing this "give[s] life to a distinction created by Congress," which exempted only ERISA plans *themselves* from being regulated as insurers under state law. *Id.*; *see* 29 U.S.C. § 1144(b)(2)(B).

49

### 3. The record in this case provides no basis to protect McKee's PBM from state regulation.

The precedent above undermines the district court's overly general analysis. The court declared that the Pharmacy Inclusion Laws could not be "appli[ed] to self-funded [ERISA] plans" or PBMs acting "on [such plans'] behalf." *McKee*, 2025 WL 968404, at *14. But the law is more nuanced, and the details of the PBM's role make all the difference. *See supra* Part II.C.2. Here, the record reflects substantial obfuscation regarding who actually made and maintained the McKee Plan's pharmacy network. And that made it improper for the district court to declare the Pharmacy Inclusion Laws inapplicability in such sweeping terms.

The trouble starts with McKee's failure to distinguish its role as plan fiduciary from its role as plan sponsor. Only in its capacity as sponsor can McKee make decisions similar to the "settlor" of traditional trust law. *Coyne*, 98 F.3d at 1465. And that includes "establishing a[n ERISA] plan" through documents that dictate the plan's substantive "benefits." *Id.* (citing *Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996)); *see Pegram*, 530 U.S. at 226; *Chambers*, 903 F.3d at 848. Thus, if the Court conceives of the pharmacy network as a substantive benefit — rather than a cost-control mechanism, *but see supra* Part II.A.2 — ERISA would protect

50

only McKee's right to set the "terms of conditions" of network participation in its capacity as ERISA-plan sponsor, Tenn. Code Ann. § 56-7-3121(a); *see id.* §§ 2359(a), 3121(b); *Spink*, 517 U.S. at 890; *deSoto*, 245 F.3d at 573; *Coyne*, 98 F.3d at 1465.

Different rules would apply to McKee in its separate capacity as plan "fiduciary," a role McKee can fill only "'to the extent'" it "exercises . . . 'discretionary authority' over" plan "management or administration." *Coyne*, 98 F.3d at 1465 (quoting 29 U.S.C. § 1002(21)(A)); *see Penny*, 399 F.3d at 699. McKee may not change the substantive benefits as fiduciary, because that is a "settlor-type function[]." *Coyne*, 98 F.3d at 1465 (citing *Spink*, 517 U.S. at 890); *see Pegram*, 530 U.S. at 225–26; *Penny*, 399 F.3d at 699. So if the network's composition is a substantive benefit, McKee cannot freely change it as a fiduciary. *See Pegram*, 530 U.S. at 225–26.

Yet in this case, it is not even clear that McKee made networking decisions *at all*. Although McKee alleged that it "established the . . . terms and conditions of [its ERISA] plan, including . . . the providers of [plan] benefits," Am. Compl., R.83 at 1067, the record indicates that McKee actually purchased access to "the *MedImpact* [pharmacy] network." Plan Summary, R.118-1 at 1605 (emphasis added). If that is true,

51

MedImpact does not act "on . . . behalf" of McKee's ERISA plan when it makes or maintains the pharmacy network. *McKee*, 2025 WL 968404, at *14. Instead, it acts as an insurance provider subject to state regulation. *Cf. Miller*, 538 U.S. at 336 n.1 (applying the same logic to HMOs).

In a transparent attempt to work around this inconvenient fact, McKee and MedImpact have claimed they "jointly determine which pharmacies are included in the Plan's pharmacy network." McKee Summ. J. Br., R.119 at 1615; *see* Pellington Decl., R.139-1 at 2158. But McKee and MedImpact cannot share decision-making authority without sharing that authority's attendant obligations. *See supra* at 48. And someone must be "the final arbiter" of network terms and composition — they cannot both be mere agents of each other. *Caremark*, 474 F.3d at 476.

Of course, to the extent MedImpact exercises discretionary judgment, it must do so either as a Plan fiduciary or an outside insurance company. *See supra* at 48–49. That is, MedImpact *could* be regulated as an ERISA fiduciary if it had "discretionary responsibility" to enforce the terms of network participation as defined by McKee. *Coyne*, 98 F.3d at 1466; *cf. Caremark*, 474 F.3d at 476–77 (addressing this issue with respect to formulary composition). But it appears more likely that

52

MedImpact has sold McKee access to its own network, thereby engaging in the state-regulated "business of spreading risk." *Gregoire*, 147 F.3d at 1046; *see Miller*, 538 U.S. at 338; *see supra* at 48–49.

That must be what MedImpact does when it "determines which pharmacies are included in the Plan's . . . network" and decides which ones to "remove[]." McKee Summ. J. Br., R.119 at 1615. If such conduct implicates plan "design" — as McKee has insisted, *id.* at 1632 — it also constitutes the business of insurance, *see Miller*, 538 U.S. at 338.

*

The bottom line is that McKee cannot spin ERISA every which way. As best understood, the Pharmacy Inclusion Laws escape ERISA preemption by impacting (at most) the cost of offering a formulary without dictating substantive plan benefits. *See supra* Part II.A.2. But if federal courts' references to "substantive coverage" can be read to include the terms and conditions of participation in a pharmacy network, *Rutledge*, 592 U.S. at 88, then Tennessee's Pharmacy Inclusion Laws must — by necessary implication — "regulate[] insurance" and be saved from preemption, 29 U.S.C. § 1144(b)(2)(A). It follows that Commissioner Lawrence can generally enforce these laws against PBMs like

53

MedImpact. *See supra* Part II.C.2. And a PBM cannot "determine which pharmacies are included in" an ERISA plan's "network" without being regulated *either* under ERISA (as a fiduciary) *or* under State law (as an insurer). McKee Summ. J. Br., R.119 at 1615; *see supra* Part II.C.3.

## III. The district court granted improper relief.

All else aside, this Court should bring the district court's remedial orders into line with binding precedent. At the end of its opinion, the district court "permanently enjoined" Commissioner Lawrence "from enforcing [the Pharmacy Inclusion Laws] against" the McKee plan. *McKee*, 2025 WL 968404, at *14 (emphasis omitted). And the injunction was explicitly drafted to "include[] . . . enforcement" of the laws "against [MedImpact] for actions [MedImpact] takes on [the McKee Plan's] behalf." *Id.* The district court then supplemented its injunction with several abstract declarations stating that the challenged laws are "invalid as applied" to all "self-funded [ERISA] plans." *Id.* This relief rests on several "legal mistake[s]." *Digital Media*, 59 F.4th at 777.

*First*, the declaratory relief exceeded the district court's jurisdiction. The Declaratory Judgment Act did not convert federal courts from "deciders of disputes" into "oracular authorities." *Duling*, 782 F.2d at

54

1205. Instead, it provided them with "an alternative to the strong medicine of the injunction" when equity favors more tempered relief to resolve a genuine dispute. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 33 (2008) (quoting *Steffel v. Thompson*, 415 U.S. 452, 466 (1974)). Federal courts thus may issue declaratory relief only to settle "case[s] of actual controversy." 28 U.S.C. § 2201(a). And that means a declaratory judgment must be limited to addressing the relative rights of the parties in "the concrete context" of the case at bar. *Ammex*, 351 F.3d at 706.

In this case, the district court disregarded that limitation by attempting to adjudicate the rights of *all* "self-funded [ERISA] plans." *McKee*, 2025 WL 968404, at *14. Indeed, "what makes" a "judicial pronouncement . . . proper" is its "settling of some dispute which affects the behavior of *the defendant* towards *the plaintiff*." *Hewitt v. Helms*, 482 U.S. 755, 761 (1987) (emphasis omitted). But here, *no* ERISA plans "are []parties" to the case "who would . . . be bound by the [district court's] judgment." *Lee*, 102 F.4th at 342 (quoting *Haaland v. Brackeen*, 599 U.S. 255, 293 (2023)). The declaration thus comes *not* as a "milder alternative to" an injunction, issued to resolve McKee's rights in relation to Commissioner Lawrence. *Perez v. Ledesma*, 401 U.S. 82, 111 (1971) (Brennan,

55

J., concurring in part and dissenting in part). On the contrary, the declaration comes as an attempt to address the abstract validity of the Pharmacy Inclusion "[L]aws themselves." *Jackson II*, 595 U.S. at 44 (quoting *Jackson I*, 141 S. Ct. at 2495), which transgresses "[t]he oldest and most consistent" rule of federal court jurisdiction. *Boyle*, 68 F.3d at 1100 (quoting *Flast*, 392 U.S. at 96–97); *see Lee*, 102 F.4th at 342; *Am. Physicians*, 13 F.4th at 536; *Duling*, 782 F.2d at 1205.

*Second*, the district court committed a similar error with respect to its permanent injunctive relief. That is, although the court tried to craft a "party-specific" injunction, it did not limit the injunction to the parties actually before it. *L.W.*, 73 F.4th at 415. Recall that this case has been brought by McKee Foods Corporation in its capacity "as a plan sponsor," "as a plan fiduciary," or perhaps "both." McKee Summ. J. Reply, R.139 at 2138. *But see supra* Part I.A. And McKee's only hope of invoking federal jurisdiction is to claim that Commissioner Lawrence is on the verge of prosecuting McKee. *See supra* Part I.B. The district court's remedial order has therefore created a mismatch between the party bringing suit and the parties receiving relief. Specifically, the district court erred by

56

enjoining Commissioner Lawrence from taking action against the McKee *plan* and the *plan's* PBM. *See McKee*, 2025 WL 968404, at \*14.

The McKee plan is an entity distinct from McKee in the same way that a trust is distinct from its settlor and its trustee. *See supra* at 9–10. And MedImpact, the plan's PBM, is a whole separate company distinct from both McKee and the Plan. *See supra* at 11–12. Thus, if MedImpact feared "a '*certainly impending*' threat of prosecution" for violating Tennessee law, it should have brought its own lawsuit to have its rights against Commissioner Lawrence adjudicated. *Friends*, 108 F.4th at 435 (quoting *Crawford*, 868 F.3d at 454); *see L.W.*, 73 F.4th at 415. And if the district court thought the Pharmacy Inclusion Laws could not be applied to the McKee *plan*, the court should have identified "exactly what conduct" of *McKee's* — as settlor or as trustee — deserved a judge-made shield for use against Commissioner Lawrence's conduct. *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 362 (6th Cir. 2022) (quoting *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016)).

*Finally*, and of a piece with the prior two errors, the district court's order was "broader than necessary to remedy the" supposed "constitutional violation." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1069 (6th

57

Cir. 1998) (citing *Knop v. Johnson*, 977 F.2d 996, 1008 (6th Cir. 1992)). Recall that the district court based its assertion of jurisdiction on McKee's operation of the McKee Foods Family Pharmacy. *McKee*, 2025 WL 968404, at \*6. The ostensible, anticipated constitutional violation thus had to be an enforcement action against McKee for "offering [plan] participants a financial incentive 'to utilize [that] pharmacy.'" *Id.* (quoting Tenn. Code Ann. § 56-7-3120(b)(2)). But just as in its merits analysis, the district court's remedial order jettisoned that "focus[]" entirely, leading to injunctive and declaratory relief addressing hypothetical future circumstances. *L.W.*, 73 F.4th at 415.

None of this is at all consistent with Sixth Circuit jurisprudence regarding pre-enforcement challenges to state laws. *See, e.g.*, *Christian Healthcare*, 117 F.4th at 843; *Friends*, 108 F.4th at 435; *Lee*, 102 F.4th at 342; *L.W. I*, 73 F.4th at 415; *Am. Physicians*, 13 F.4th at 536; *Ammex*, 351 F.3d at 706–08. If nothing else, this Court should reverse the district court's remedial order and require a more cabined form of relief.

\*  \*  \*

"[I]n the field of health care, a subject of traditional state regulation, there is no ERISA preemption without clear manifestation of

58

congressional purpose." *Rush Prudential*, 536 U.S. at 387 (quoting *Pegram*, 530 U.S. at 237).  And denying States "'the right to experiment'" with "varied efforts to" tackle "great public issues . . . 'may be fraught with serious consequences to the nation.'" *Boyle*, 68 F.3d at 1109 (quoting *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting)).  "It is one of the happy incidents of the federal system that a . . . [S]tate may . . . serve as a laboratory" for policy "experiments." *Id.* (quoting *Liebmann*, 285 U.S. at 311) (Brandeis, J., dissenting).  Tennessee's Pharmacy Inclusion Laws do that; this case presents no occasion to annul them by panoramic decree.

## CONCLUSION

The Court should reverse the district court's grant of summary judgment as well as its order of declaratory and injunctive relief.

Dated: July 30, 2025

Respectfully Submitted,

Jonathan Skrmetti
  *Attorney General & Reporter*

J. Matthew Rice
  *Solicitor General*

Michael N. Wennerlund
  *Assistant Attorney General*

*/s/ Gabriel Krimm*
Gabriel Krimm
  *Senior Assistant Solicitor General*
State of Tennessee
Office of the Attorney General
P.O. Box 20207
Nashville, TN 37202
Gabriel.Krimm@ag.tn.gov
(615) 532-5596
  *Counsel for the Commissioner of
  the Tennessee Department of
  Commerce and Insurance*

## CERTIFICATE OF COMPLIANCE

This brief complies with the Court's type-volume limitations because it contains 12,383 words, excluding portions omitted from the Court's required word count.

This brief complies with the Court's typeface requirements because it has been prepared in Microsoft Word using fourteen-point Century Schoolbook font.

*/s/ Gabriel Krimm*
Gabriel Krimm

## CERTIFICATE OF SERVICE

On July 30, 2025, I filed an electronic copy of this brief with the Clerk of the Sixth Circuit using the CM/ECF system. That system sends a Notice of Docket Activity to all registered attorneys in this case. Under 6 Cir. R. 25(f)(1)(A), "[t]his constitutes service on them and no other service is necessary."

*/s/ Gabriel Krimm*
Gabriel Krimm

## DESIGNATION OF RELEVANT DOCUMENTS

The following record documents are relevant to this appeal:

| Document | R. | Page(s) |
|---|---|---|
| Complaint (with Attachments) | 1 | 1–44 |
| Order Dismissing Case | 67 | 794–801 |
| Order Managing Remand | 73 | 887–88 |
| Order Permitting Complaint Amendment | 82 | 1051–65 |
| Amended Complaint (with Attachments) | 83 | 1066–1114 |
| Commissioner Lawrence's Answer | 17 | 1526–37 |
| McKee's Motion for Summary Judgment | 118 | 1538–1610 |
| McKee's Brief Supporting Summary Judgment | 119 | 1611–1886 |
| Commissioner Lawrence's Motion for Summary Judgment | 122 | 1911–15 |
| Commissioner Lawrence's Brief Supporting Summary Judgment | 123 | 1916–39 |
| Commissioner Lawrence's Response Opposing McKee's Motion for Summary Judgment | 134 | 2003–19 |
| McKee's Response Opposing Commissioner Lawrence's Motion for Summary Judgment | 135 | 2020–62 |
| McKee's Reply in Support of Summary Judgment | 139 | 2134–73 |
| Commissioner Lawrence's Reply in Support of Summary Judgment | 140 | 2174–85 |
| Opinion and Order Granting Summary Judgment | 142 | 2203–32 |
| Judgment | 143 | 2233 |
| Commissioner Lawrence's Notice of Appeal | 145 | 2255 |